IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TABATHA JACKSON, *et al.*, | ) CIVIL ACTION NO. 1:20-CV-02649 |
| Plaintiffs, | ) JUDGE CHARLES ESQUE FLEMING |
| v. | ) |
| CUYAHOGA COUNTY, *et al.*, | ) |
| Defendants. | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT CUYAHOGA COUNTY AND SUBPOENAED NON-PARTY ARMOND BUDISH'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

Now come Plaintiffs Tabatha Jackson and Phyllis Davis, through undersigned counsel, and hereby respectfully request that this Honorable Court deny Defendant Cuyahoga County and subpoenaed non-party Armond Budish's motion to quash subpoena and for a protective order.

**MEMORANDUM**

Federal Rules 26(b) and 30(a) allow a party to depose any person "regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1); FED. R. CIV. P. 30(a). Courts have long recognized that depositions are an essential part of the discovery process: "Only by examining a witness live can a lawyer use the skills of his trade to plumb the depths of a witness' recollection, using to advantage not only what a witness may have admitted in answering interrogatories, but also any new tidbits that usually come out in the course of answering carefully framed and pin-pointed deposition questions." *Shoen v. Shoen*, 5 F.3d 1289, 1297 (9th Cir. 1993).

1

For that reason, "it is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Big Ernie's, Inc. v. United States*, No. 1:09-cv-00122, 2009 WL 3166839 (E.D. Va. Aug. 13, 2009) (quoting *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979)).

Defendant and Budish's motion in no way justifies this extraordinary relief here. According to the Kenneth Mills trial transcript, associate warden Victor McArthur testified that Mills admitted to him "that he [Mills] didn't know anything about jails[.]" (Trial Transcript of Victor McArthur, Ex. A.) Notwithstanding this stunning admission, Budish tapped Mills to be the director of regional corrections for the second largest county in Ohio—even though he had no experience whatsoever working in corrections. The same day Budish appointed Mills to lead the jail, a county news release announcing his appointment said that Mills would direct operations in the jail, and that his position would eventually become self-sustaining from the revenue generated by regionalizing the jail. Last year, Mills was convicted of dereliction of duty for mismanaging the jail and allowing inhumane conditions of confinement.

Further supporting denial of Defendant and Budish's motion is the fact that the Northern District of Ohio has already recognized the integral and unique nature of Budish's involvement in implementing the regionalization plan: "Cuyahoga County Executive Armond Budish and his administration developed a regionalization plan for Cuyahoga County's jails to increase revenue for the County by charging local governments to house their detainees and prisoners. *See Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 656 (6th Cir. 2021). In March 2018, the Budish administration executed the

2

regionalization plan, which aggravated severe overcrowding and understaffing. *Id.* at 656–57." *Brack v. Budish*, No. 1:19-CV-01436, 2022 WL 1192784, at *2 (N.D. Ohio Apr. 21, 2022) (Calabrese, J.).

Mills was the political appointee selected by Budish to ensure the implementation of the county's regionalization plan. As relevant here, the regionalization policy was rolled out by Budish so that the county could make more money by charging the City of Cleveland and municipalities to house their inmates ($99.00 per day, per inmate). Budish is uniquely positioned to provide insight on those efforts, and why he chose Mills to lead them. Neither the documents nor any alternative witnesses can adequately substitute for Budish's first-hand testimony on numerous, critical points. At the Mills trial, county budget director Maggie Keenan testified that despite serious concerns about whether the jail had the ability to house more inmates, "at this point in the game in the budget process the regional jail project was going forward. *That was the direction from Armond Budish. It was going forward.* It was going forward with these amounts." (Trial Testimony of Maggie Keenan, Ex. B.) Defendant and Budish's generic and overbroad claims of being too busy with county affairs are no reason to preclude Budish's deposition. (*See* Budish Decl.) Importantly, Budish does not deny having *personal* knowledge of the conditions of confinement (Class Count I and Individual Count I)—a central issue in this case. (*Id.*)

Indeed, Budish's self-serving declaration concerning his "'many obligations and time constraints' and his 'numerous official responsibilities'… can be said about any high-ranking official, corporate or governmental, and it is difficult to square such generalities with the need to make a specific showing of undue burden under Rule 26(c).

3

Obligations, time constraints, and official responsibilities are all part of the job of any busy official, including [Budish], and cannot be used as a blanket pass against being deposed in any and all cases involving the duties of the office." *Duncan v. Husted*, No. 2:13-CV-1157, 2015 WL 631103, at *3 (S.D. Ohio Feb. 12, 2015).

### I. Exceptional Circumstances Require Budish's Deposition Because He was Personally Involved in Carrying Out the Regionalization Plan.

"Exceptional circumstances" for deposing a government official exist where the official "ha[s] personal involvement in a material aspect of the claim presented." *United States v. Wal-Mart Stores*, No. Civ.A. PJM-01-CV-152, 2002 WL 562301, at *2 (D. Md. Mar. 29, 2002) ; *see also United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 322 (D.N.J. 2009) ("Courts have time and again allowed the deposition of current and former high-ranking government officials upon a showing that the official has personal involvement or knowledge relevant to the case."); *NRA v. Cuomo*, No. 1:18-CV-566, 2019 WL 2918045, at *5 (N.D.N.Y. Mar. 20, 2019) (allowing deposition of New York's former Superintendent of Financial Services where her "specific rationale for her alleged actions is at issue"); *Greater Birmingham Ministries v. Merrill*, 321 F.R.D. 406, 413 (N.D. Ala. 2017) (permitting deposition of Alabama's Secretary of State where "Secretary Merrill's role with respect to implementation of the challenged Photo ID Law has been ongoing since he assumed office," and "Plaintiffs have sufficiently established that…he has been personally involved in implementing the law"); *Fish v. Kobach*, 320 F.R.D. 566, 579 (D. Kan. 2017) (allowing deposition of Kansas Secretary of State where "the official [was] shown to have exclusive first-hand knowledge directly relevant to the claims being litigated");

4

*Libertarian Party v. Husted*, 33 F. Supp. 3d 914, 920 (S.D. Ohio 2014) (permitting deposition of Hearing Officer and General Counsel for the Ohio Secretary of State); *United States v. City of New York*, No. 07-cv-2067, 2009 WL 2423307, at *2–3 (E.D.N.Y. Aug. 5, 2009) (authorizing the deposition of the Mayor of New York City where the Mayor's congressional testimony "suggest[ed] his direct involvement in the events at issue in the case"); *Bagley v. Blagojevich*, 486 F. Supp. 2d 786, 789 (C.D. Ill. 2007) (allowing the deposition of the Governor of Illinois where evidence suggested "the Governor was either the ultimate decision maker or at least personally involved" in the decision at issue); *Energy Capital Corp. v. United States*, 60 Fed. Cl. 315, 318 (Fed. Cl. 2004) (authorizing depositions of the former Secretary of Housing and Urban Development, and HUD's former General Counsel, holding "it is also clear in the context of deposing former high-ranking government officials is that depositions are allowed if the party has personal knowledge of the facts in issue"); *Martin v. Valley Nat'l Bank of Ariz.*, 140 F.R.D. 291, 314–15 (S.D.N.Y. 1991) (authorizing the deposition of the Director of Enforcement for the Department of Labor who "was apparently involved" personally in the challenged government decisions); *Am. Broad. Cos. v. U.S. Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984) (permitting deposition of agency chief where he was "the sole person responsible for the creation of the documents in question").

Indeed, there can be no doubt that Budish was uniquely and personally involved in the factual issues at the heart of this case. Regarding the rolling out of the regionalization plan, Donna Kaleal, the sheriff's office's business manager, testified that if Mills did not like how the plan was being implemented, "he would go to Armond

5

[Budish] and then Armond would make them reverse it." (Trial Testimony of Donna Kaleal, Ex. C. at 93.) For example, Budish intentionally kept Kaleal out of the contract negotiations related to "the county's plan to expand the jail and generate revenue by charging other cities to house their inmates[.] This was the only time in Kaleal's nearly two decades at the sheriff's department when a contract involving the sheriff's department got submitted to council without her approval[.]"[1] Further, Phillip Angelo, special assistant with the sheriff's office, testified that the regionalization plan could not have happened without the express approval of Budish, the County Executive:

> Q: And you would agree with me, Mr. Angelo, those mergers would not happen unless the sheriff approved them?
>
> A: Don't know if I can agree with that.
>
> Q: Okay. Well, who would have to approve them, the county executive?
>
> A: County executive, yeah.
>
> Q: So certainly people well above Mr. Mills' pay grade.
>
> A: Correct.

(Trial Testimony of Phillip Angelo, Ex. D.)

And Edward Kraus also testified that Budish was integral to the regionalization plan, testifying as follows:

> A: Good first meeting yesterday with Judge Mary Kay Bozza at Lyndhurst Court. Walked her through procedures of taking Richmond Heights inmates. Mayor Roche was there with his chief.

---

[1] Cory Shaffer, *Prosecutors Rest Case Against Ex-Cuyahoga County Jail Director Without Calling Budish*, CLEVELAND.COM, Sep. 7, 2021, https://www.cleveland.com/court-justice/2021/09/prosecutors-rest-case-against-ex-cuyahoga-county-jail-director-without-calling-budish.html.

6

> Richmond Heights planning to shut their jail and transport prisoners to Euclid. This could be start of true jail regionalization. Once completed then they will move to regional dispatch center. Thanks to Ken Mills and the warden for explaining the process.

Q: After you sent that to the Executive Armond Budish did Mr. Budish respond to your e-mail?

A: I believe with a one sentence. Correct.

\* \* \*

Q: And what was the text of Mr. Budish's e-mail to you and those individuals?

A: Please make sure they understand $99.

Q: And do you understand the statement that was made? Have you seen that statement before or were you familiar with it?

A: I was.

Q: And tell us how.

A: That was his direction that the cities would pay $99 per day per prisoner if they were going to participate in a regional jail operation and I believe this one specifically mentions the City of Euclid.

(Trial Testimony of Edward Kraus, Ex. F.)

Regarding healthcare at the jail (Individual Count II), after whistleblower Gary Brack stepped forward at a County Council meeting with grave concerns about Mills's refusal to hire more nurses, Budish's former chief of staff, Earl Leiken, testified that he "had a discussion with the county executive [Budish]" shortly thereafter. (Trial Testimony of Earl Leiken, Ex. E at 55.) "[Budish] decided to call Metro. [Budish] did not feel this was a very healthy working situation where Mr. Brack was so hostile to Mr. Mills and asked for a meeting the next day to see if Mr. Brack might be reassigned. And so I

7

went with the [Budish] to that meeting which was the next day." (*Id.*) Due to being a whistleblower, Budish forced Dr. Akram Boutros, CEO of MetroHealth, to remove Brack from his nursing supervisory position at the jail:

> For example, before its more recent efforts to improve healthcare at the jail, MetroHealth and its leadership team headed by chief executive officer Dr. Akram Boutros took actions *at the behest of Budish and his administration* that allowed the regionalization efforts at the heart of the jail's troubles to proceed. When Gary Brack, a nurse who worked at the jail for MetroHealth, warned the Public Safety Committee of the Cuyahoga County Council at a public hearing on May 22, 2018 of the Budish administration's actions that jeopardized detainees at the jail, *Budish personally requested that Dr. Boutros remove Mr. Brack from his work at the jail*. Although he knew better, Dr. Boutros complied. This failure of leadership contributed to the controversy that continues to surround the jail and deserves condemnation.

*Brack v. Budish*, 2022 WL 1192784, at *1 (emphasis added).

Leiken initially testified that "[w]e [himself and Budish] investigated to determine whether or not there were problems in the jail with respect to the nurse staffing issue." (Leiken Testimony, Ex. E at 57–8.) After a sidebar with Judge Cosgrove, Leiken happened to remember that he signed a proffer agreement whereby he informed law enforcement that there was, in fact, no investigation conducted by himself or Budish into Brack's allegations. (*Id.* at 58–9.)

Additionally, former Administrative Judge John J. Russo penned a letter to Budish, on behalf of himself and every Cuyahoga County Common Pleas judge, pleading for Budish to remedy the abhorrent conditions plaguing the jail. (Ex. G.) This letter, dated November 8, 2020, was received by Budish before the Plaintiffs were housed in the jail; thus, Budish was on notice of the deplorable conditions of confinement within the jail

8

prior to the Plaintiffs' injuries, and was deliberately indifferent to the chaos he caused in the jail. Judge Russo wrote:

> Dear Executive Budish: The judges of the Cuyahoga County Court of Common Pleas General Division are concerned with conditions in the Cuyahoga County Corrections Center, parentheses county jail[.] The county's indifference to the dangers created by failing to meet the needs of the very fragile and volatile prison population must end. It is imperative that you and your county leaders respond in a timely manner to these concerns.
> 
> The health and the safety of those in the county jail is the county's responsibility. The court is not responsible for the operations of the county jail but we cannot ignore the effect of current conditions upon incarcerated individuals. The judges of this court can no longer rely on statements made by those you have chosen to operate the county jail that much needed change is coming.
> 
> Shortage of staffing in the jail contributes to a lack of identification of people who need medical and psychiatric care upon booking. Inmates wait as long as four weeks to see medical and psychiatric staff and even longer for necessary prescriptions. Delayed medication results in decompensation and increased psychotic episodes. In addition, due to their deteriorating medical condition defendants often require referral at a significant cost for restoration to competency.
> 
> On behalf of the judges, as administrative judge, I've repeatedly expressed concerns regarding the policies and procedures including the medical care of the jail. We ask that you take appropriate steps following the current county and FBI investigations to ensure the safety of the county jail population and employees.
> 
> The judges of the court cannot have a discussion regarding the safety within the jail without raising serious concerns about the safety within the Justice Center. Again, I have brought security issues in the Justice Center to the desks of two county executives, you and Ed Fitzgerald, and three sheriffs, Robert Reid, Frank Bova and Cliff Pinkney. The safety and welfare of the court and the sheriff's department staff, clients, attorneys and public who appear in our courtrooms have to be improved and maintained.
> 
> The lack of sheriff's deputies or the security personnel on the courtroom floors of the Justice Center has been a concern for years. This leaves people in the courtrooms where emotions and tensions run high at the greatest risk of danger[.] However, every day that we delay is a cause for concern.
> 
> The sheriff deputies on court floors are hard working employees. Still, the lack of deputies to escort defendants from the jail to the courtrooms and provide security for hearings delays justice.

> We have repeatedly tried to bring these issues to the county and remain willing to work with you on potential resolutions. We hope the county is not putting a price on the safety of its citizens.
>
> Sincerely, John J. Russo, administrative and presiding judge.

(*Id.* at 13–5.)

Finally, Maggie Keenan, director of the office of budget and management for the County, testified: "In April of 2018 there was absolutely no denying that we were in crisis." (Keenan Testimony, Ex. H.) And per Leiken's testimony, Keenan sent Budish an email on April 18, 2018, stating:

> I want to make you aware of a critical situation in the county jail regarding nurses.
>
> \* \* \*
>
> There are six vacant nurses in the downtown county jail which as of March had an ADP of 2,331. The jail is rated for approximately 1700. It's overcrowded. Prisoners are sleeping on mats on the floor and our population is disproportionately unhealthy. A shortage of nurses creates risk. The county settles a lot of medical-related lawsuits, the most significant of course was the Levert death.
>
> \* \* \*
>
> If there's anything OBM can do to help and address this issue please let me know.

(Ex. I at 51–3.) Despite requesting this email through discovery, the Defendants have failed to provide it thus far.

10

**II. The Sixth Circuit Specifically Disavowed the "Apex Doctrine" because it does not Recognize that there is Inherent Harassment or Abuse when trying to Depose an Opposing Party's High-Ranking Official.**

In *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012), the Sixth Circuit specifically disavowed the "apex doctrine" and held that harassment and abuse are not inherent in depositions of high-level corporate officers. (*Contra* Defs.' Mot. 10.) Instead, "[the Sixth] Circuit has endorsed the view that to justify a protective order, one of Rule 26(c)(1)'s enumerated harms 'must be illustrated "with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."' *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 550 (6th Cir.2004) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)). In keeping with this principle, while we sometimes have considered the need for the deposition—i.e., its potential to result in relevant testimony—in reviewing the grant or denial of a protective order, we have not abandoned the requirement that one of the harms listed in Rule 26(c)(1)(A) must be specified in order to warrant a protective order." *Serrano*, 699 F.3d at 901.

Further, other District Courts in the Sixth Circuit have found the "apex" doctrine distasteful and contrary to the American system of government:

> Indeed, Secretary Husted, like any other elected official, should understand that no formulations of the "apex" doctrine places him above the law. To give legitimacy to the strained reading of the "apex" doctrine urged by Defendant Secretary upon the Court would undermine both public accountability and the system of checks and balances itself. The Supreme Court recognized this time honored concept in *United States v. Bryant*:
>
> Dean Wigmore stated the proposition thus: 'For more than three centuries it has now been recognized as a fundamental maxim that the public ... has a right to every man's evidence. When we come to examine the various

11

claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'

339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950).

*Duncan v. Husted*, No. 2:13-CV-1157, 2015 WL 631103, at *3–4 (S.D. Ohio Feb. 12, 2015).

### III.     The *Morgan* Doctrine.

This case is also readily distinguishable from *United States v. Morgan* and its progeny, which limit questions which would "probe [the officials'] mental processes." 313 U.S. 409, 421–22 (1941). Here, Plaintiffs seek essential, factual testimony that Budish can uniquely provide, as outlined above. In *Franklin Savings Association v. Ryan*, 922 F.2d 209 (4th Cir. 1991), for example, the Fourth Circuit considered the propriety of a deposition of the Director of the Office of Thrift Savings. Neither the Fourth Circuit nor the parties challenged the Director's deposition as a whole—indeed, the court noted the Director "responded to the subpoena and answered all questions directed at him with the exception of five." *Id.* at 210. Instead, the court held the district court erred by requiring the Director to answer five questions that "clearly went to the mental processes by which [the Director] arrived at his decision," where there was no "misconduct or wrongdoing" justifying an exception from *Morgan*. *Id.* at 211.

As a threshold matter, here Plaintiffs are claiming, and have made a showing, of "misconduct or wrongdoing": deliberate indifference to conditions of confinement and medical care. Moreover, Plaintiffs are not seeking discovery of Budish's "mental processes," let alone of "mental processes" that are irrelevant or unnecessary to their

12

claims, as in *Morgan* and the other cases Defendants cite. Instead, Budish's testimony is required to address essential factual questions regarding key events and decisions in which Budish was personally and directly involved.

                                      Respectfully submitted,

                                      /s/ Kevin M. Gross
                                      Lewis A. Zipkin, Esq. (0030688)
                                      Kevin M. Gross, Esq. (0097343)
                                      ZIPKIN WHITING CO., L.P.A.
                                      The Zipkin Whiting Building
                                      3637 Green Road
                                      Beachwood, Ohio 44122
                                      T: 216-514-6400 F: 216-514-6406
                                      zfwlpa@aol.com
                                      kgross@zipkinwhiting.com

                                      *Counsel for Plaintiffs Tabitha Jackson*
                                      *and Phyllis Davis*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I certify this memorandum complies with the 15-page limit for standard track, non-dispositive motions as set forth in Local Rule 7.1.

> /s/ Kevin M. Gross
> Lewis A. Zipkin, Esq. (0030688)
> Kevin M. Gross, Esq. (0097343)
>
> *Counsel for Plaintiffs Tabitha Jackson and Phyllis Davis*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on May 17, 2022, via the Court's CM/ECF system upon:

Michael J. Stewart, Esq.
Brendan D. Healy, Esq.
Jillian Eckart, Esq.
CUYAHOGA COUNTY PROSECUTOR'S OFFICE
The Justice Center, Courts Tower
1200 Ontario Street, 8th Floor
Cleveland, OH 44113
Phone:(216) 443-6673; (216) 698-6447; (216) 443-7618
Fax: (216) 443-7602
Email: mjstewart@prosecutor.cuyahogacounty.us
       bhealy@prosecutor.cuyahogacounty.us
       jeckart@prosecutor.cuyahogacounty.us

*Attorneys for Defendant Cuyahoga County and Randy Pritchett and Subpoenaed Non-Party Armond Budish*

> /s/ Kevin M. Gross
> Lewis A. Zipkin, Esq. (0030688)
> Kevin M. Gross, Esq. (0097343)
>
> *Counsel for Plaintiffs Tabitha Jackson and Phyllis Davis*