

1    MR. SPELLACY:  Objection, Judge.

2    THE COURT:  What?

3    MR. SPELLACY:  Nothing.

4  Q.    Did you have conversations with the defendant

5  regarding his qualifications to run a jail?

6  A.    When he first came in, yes, sir.

7  Q.    And where would you have these conversations

8  at?

9  A.    In the office.

10  Q.    And what did the defendant tell you?

11  A.    He said that he didn't know anything about

12  jails and he depended on myself and Warden Ivey.

13  Q.    And who's Warden Ivey?

14  A.    He was the other associate warden.  There were

15  two of us.

16  Q.    Did Warden Ivey have responsibilities

17  different than you?

18  A.    Yes.  Actually, I had one jail, he had another

19  jail, we had other responsibilities.  I was in charge

20  of training.  He had medical and SRT, special

21  response team.

22  Q.    Now, between 2015 and 2017 how many inmates

23  would you say were in the Cuyahoga County Jail at any

24  given time?

25  A.    Upwards of 2,000.



PLAINTIFF'S EXHIBIT B

Q.      And what did Mr. Bova say there?

A.      I believe the top two were proposed by companies who inquired about doing business with the county.  The bid process will either prove or disprove the numbers provided.  I may be wrong but that is my recollection.

        The third is if the county executive approves construction of the old kitchen to house upwards of 200 inmates that would then start countywide jail regionalization.  That is the proposal as I remember. Someone correct me if I am wrong.  Prefer to be called not e-mailed about this.  Thank you.

Q.      Okay.  So did Ken send that to you?

A.      He did.

Q.      Did you read it?

A.      I did.

Q.      Did you reply?

A.      I did.

Q.      And what did you say?

A.      I said, "Ugh."

Q.      Now seeing that thread and reading it through, do you remember now why you said, "Ugh?"

A.      Yes.

Q.      Why did you say that?

A.      Because at this point in the game in the

16:49:53

16:50:06

16:50:16

16:50:20

16:50:29

budget process the regional jail project was going forward.  That was the direction from Armond Budish. It was going forward.  It was going forward with these amounts.  And as you have already pointed out, Ken frequently sent me e-mails from Donna complaining about her when she asked for additional information and so apologies but this is effectively me just like rolling my eyes because sometimes it's too much for me.

Q.    You use that phrase "game."  Is that an appropriate phrase or appropriate term?  Is this game?

A.    No.  This is not a game.

Q.    Next we're going to go to Exhibit 67, Bates stamp 294.

Do you recognize what I'm showing you there?

A.    Yes.

Q.    What have I shown you there?

A.    This is an e-mail from me to Ken, August 30th, 2017.  Subject:  Budget.

Q.    And this is more discussions about the jail budget?

A.    Yes.

Q.    And did you include -- well, who was the discussion between, yourself and who?

1  you that he ultimately stopped the hiring of the

2  nurses at Euclid?

3  A.      He mentioned it to me.

4  Q.      Did he ask for your opinion?

5  A.      He told me.  He didn't ask my opinion.  He

6  told me he knew we needed many more than just two

7  nurses.  He was going to go in and ask for more money

8  to get even more nurses.

9  Q.      He stopped Euclid and he was going to put it

10 all together so he could go one time?

11 A.      My understanding was he wanted to ask for more

12 money for more nurses.

13 Q.      So my question was he wanted to get all of the

14 nurses at one time, correct?

15 A.      I don't know what his intentions were.  He

16 just said --

17 Q.      Did he stop the hiring of the two nurses?

18 A.      I don't know about stopping.  He told me he

19 wanted to ask for more money for more nurses.  I

20 don't know about stopping.

21 Q.      A few minutes ago you talked about Naphcare,

22 right?

23 A.      Yes.

24 Q.      And you indicated that was Ken Mills

25 yesterday, correct?

PLAINTIFF'S
EXHIBIT

1  A.      Correct.

2  Q.      And you do know, don't you, that the sheriff

3  presented this to council, correct?

4  A.      That the sheriff presented Naphcare to

5  council?

6  Q.      Yeah.

7  A.      I don't know if the sheriff presented it to

8  council.

9  Q.      So you wouldn't know that?

10  A.      I know that it was proposed in some meeting

11  and I know council was asked of the -- council asked

12  questions because council got wind of it.  I don't

13  know if it was proposed.  I don't know.

14  Q.      Well, let me ask you this:  Do you know that

15  the sheriff presented it to council?

16                    THE COURT:  Do you know?

17                    THE WITNESS:  Presented it, I don't

18        know.

19  Q.      Or proposed?

20  A.      Again, to council themselves, I don't know if

21  it was ever proposed to them.  I know they asked

22  about it and they wanted the documents.

23  Q.      Did you know that Mr. Mills had kept the

24  sheriff informed on Naphcare?

25  A.      I don't know that.  I know that Maggie

1    presented to counsel a $2 million savings.

2    Q.    Maggie did?

3    A.    Maggie did.

4    Q.    According to you?

5    A.    That's -- I'm pretty sure, yes.

6    Q.    How do you know that?

7    A.    Because I think I -- if I'm not mistaken it

8    was on -- it was on a video that I watched of a

9    council meeting.

10   Q.    And I want to show you what's been marked as

11   Defendant's Exhibit Y.  Tell me what that is.

12   A.    This is an e-mail from Ken Mills to the

13   sheriff including Chief Taylor and myself.

14   Q.    Okay.

15   A.    Okay.

16   Q.    And does it discuss Naphcare?

17   A.    Yes.

18   Q.    And does it break down Naphcare's --

19   A.    What the savings would be?

20   Q.    Budget and savings in any fashion?

21   A.    Yes.

22   Q.    And you were aware of that.  And what's the

23   date?

24   A.    September 15th, 2017.

25   Q.    So those e-mails that you were looking at in

1  August on your direct examination, did there come a

2  time when you got information from Sheriff Pinkney to

3  you, correct?

4  A.      Wait.  From Sheriff Pinkney?

5  Q.      Yes.

6  A.      Yes.

7  Q.      So to be fair, that e-mail is an e-mail from

8  Ken to Sheriff Pinkney, correct?

9  A.      Yes.

10  Q.      And you weren't on there, were you?

11  A.      No.

12  Q.      So that's another communication that you

13  didn't know about at the time, right?

14  A.      Correct.

15  Q.      And then the sheriff decided to send it to

16  you, correct?

17  A.      He decided to respond to Ken and copy me.

18  Q.      Right.  So you got that from the sheriff not

19  from Ken?

20  A.      I got that from the sheriff, correct.

21  Q.      So obviously when the sheriff wants you to

22  have something he can get it to you, correct?

23  A.      Correct.

24  Q.      I assume that would be true for Chief Taylor

25  as well, correct?

```
1   A.      Correct.
2   Q.      The same might be through for Director Bova,
3   correct?
4   A.      If they wanted to get something to me?
5   Q.      Yes.
6   A.      Yes.
7   Q.      Same for Maggie Keenan?
8   A.      Correct.
9   Q.      You indicated that every time you had a
10  problem with not receiving an e-mail you would tell
11  the chief or the sheriff, correct?
12  A.      Not every time.  Sometimes when I would ask
13  for something repeatedly then I would go to the chief
14  or the sheriff.
15  Q.      And did you always receive satisfaction from
16  either the chief or the sheriff?
17  A.      They would tell me it didn't matter what they
18  did.  If Ken didn't like it he would go to Armond and
19  then Armond would make them reverse it.
20  Q.      That's what they told you?
21  A.      That's what the sheriff told me.
22  Q.      So my question to you was did you receive
23  satisfaction when you went to them?  Yes or no.
24  A.      Sometimes.
25  Q.      And when you received that satisfaction would
```

1    it be in the form of an e-mail?

2    A.      I can't remember.

3    Q.      Well, do you have any of those e-mails?

4    A.      Do I have any e-mails basically saying -- yes.

5    Q.      Okay.  Where are those?

6    A.      There's an e-mail down here when I asked all

7    of the chief to -- I told the chief how I think the

8    Cleveland contract should be handled, that Ken's

9    staff should handle the initial entering it into On

10   Base and then fiscal pick it up and we finish it off

11   and the chief agreed with me.

12   Q.      So in the Cleveland contract, can we agree

13   that the Cleveland contract, that when you were

14   involved changed from when Mr. Mills was involved?

15   A.      Can we agree when?

16   Q.      No.  Can we agree it changed?  Yes or no.

17   A.      When Ken Mills came on board, yes.

18   Q.      The question is can we agree it changed?  Yes

19   or no.

20   A.      But what are you asking?  Did what change?

21   Q.      The contract.

22   A.      The contract.  Yes.

23   Q.      And can we agree that you weren't involved in

24   all of the details of that contract?  Yes or no.

25   A.      The final one, yes.

1  Q.     And so you don't know why those changes were
2  made, correct?
3  A.     Correct.
4  Q.     And you don't know whose input was given to
5  change those things, do you?
6  A.     Ken's was.  He was the only one in the
7  negotiations.
8  Q.     So if the sheriff changed it you wouldn't know
9  that, would you?
10  A.     I don't know.
11  Q.     Unless he told you, right?
12  A.     Unless he told me.
13  Q.     And you weren't there, right?
14  A.     Correct.
15  Q.     So you don't know, do you?
16  A.     Correct.
17  Q.     Okay.  Or if Chief Taylor changed it, correct?
18  A.     Correct.
19  Q.     Or if one of the lawyers changed it, correct?
20  A.     Correct.
21  Q.     So there's a lot of variables that you don't
22  know, correct?
23  A.     I do know now.
24  Q.     Oh, you do?  Okay.
25         And can we agree that the Cleveland contract

1  was a -- what we refer to as an emergency contract.

2  Is that fair?

3  A.     No.

4  Q.     No?  You know what an emergency contract is?

5  A.     I'm assuming it's satisfactorily explanatory

6  but maybe I'm wrong.

7  Q.     Well, it took effect immediately.

8  A.     Okay.

9  Q.     Did you know that?

10  A.     So from the time it was approved you are

11  saying it took effect.

12  Q.     Yeah.

13  A.     Yes.

14  Q.     And can we agree that maybe not all of the

15  infrastructure was in place at that point in time?

16  A.     Correct.

17  Q.     And can we agree that it was council that

18  approved that agreement as an emergency or to be in

19  effect immediately?

20  A.     Can we -- say that --

21  Q.     Well, council passed it to make it effective

22  immediately, correct?

23  A.     I know once it got passed that I -- I'm pretty

24  sure --

25  Q.     That's not my question.  If you don't know,

```
1   A.      Correct.

2   Q.      And yet you were the sheriff's right-hand man?

3   A.      Correct.

4   Q.      And so when you talk about the City of

5   Cleveland not being ready, you don't have any real

6   experience in jail management, do you?

7   A.      No.

8   Q.      And so you don't have an opinion based on any

9   prior experience, do you?

10  A.      No.

11  Q.      You and I can agree, can we not, that the City

12  of Cleveland merger and other mergers had been going

13  on for decades?

14  A.      Yeah.  Conversations had been had for a long

15  time.

16  Q.      Right.  Prior to you starting with the county,

17  correct?

18  A.      Correct.

19  Q.      And prior to Mr. Mills starting with the

20  county, correct?

21  A.      That's correct.

22  Q.      And would you agree with me, Mr. Angelo, those

23  mergers would not happen unless the sheriff approved

24  them?

25  A.      Don't know if I can agree with that.
```

**PLAINTIFF'S EXHIBIT**

tabbies

D

1  Q.      Okay.   Well, who would have to approve them,

2  the county executive?

3  A.      County executive, yeah.

4  Q.      So certainly people well above Mr. Mills' pay

5  grade.

6  A.      Correct.

7  Q.      You mentioned Mr. Kochevar earlier.   He

8  couldn't just approve it, could he?

9  A.      No.

10  Q.      Were you present when he testified before the

11  city of Cleveland council in favor of the merger?

12  A.      No.

13  Q.      Do you know that happened?

14  A.      No.

15  Q.      You've indicated you expressed some concerns

16  about the merger, right?

17  A.      Yes.

18  Q.      And did you express those concerns to Sheriff

19  Pinkney?

20  A.      Yes.

21  Q.      And when did you do that?

22  A.      As conversations were taking place during

23  meetings, after meetings.

24  Q.      So you made your voice heard to him, right?

25  A.      Yeah.



1   A.      Yes.

2   Q.      Okay.  I'm going to show you a document that's

3   been marked previously as State's Exhibit 105.  And

4   Bates stamp 442.  It's going to be on your screen

5   there and I'll ask you take a look at what you've got

6   on your screen.  I'll make it a little bit bigger

7   just so you can see.  Do you see what I've got there?

8   A.      Yes.

9   Q.      What do I have on the screen there in front of

10  you?

11  A.      That looks like an e-mail from Maggie Keenan

12  to Armond Budish, Dennis Kennedy and Earl Leiken

13  dated Wednesday, April 18th, 2018.

14  Q.      So is that an e-mail?

15  A.      It looks like an e-mail.  It's a document.

16  Q.      Did you receive e-mails during your time as

17  chief of staff for Cuyahoga County?

18  A.      Yes, I did receive e-mails.

19  Q.      And this particular e-mail, was it sent to

20  you?

21  A.      I don't recall receiving this e-mail.  I don't

22  deny that it was sent to me but I don't recall it.

23  Q.      Okay.

24  A.      It was shortly after I had started with the

25  county and I was getting all kinds of information.

Q.      In your capacity as chief of staff did you send and receive e-mails conducting the county's regular business?

A.      Yes.

Q.      And did the county's e-mail system preserve those e-mails to your knowledge?

A.      To my knowledge, yes.

Q.      Have you since seen copies of e-mails that were preserved on the county system?

A.      Yes.

Q.      Is that one of them that you've seen?

A.      This has been shown to me, yes.

Q.      Okay.  Could you please read the e-mail to us starting at the top.

                    MR. SPELLACY:  Objection.

                    THE COURT:  Overruled.

A.      I want to make you aware of a critical situation in the county jail regarding nurses.  At present there are ten vacancies which is a third of total staffing levels.  The sheriff's office has been trying to fill but is having difficulty attracting candidates due to the low wage.  Starting nurses in the jail earn $28 an hour.  The industry standard is $38 an hour.

Q.      Could you just speak up so everybody can hear

1   you as you are reading it please.

2   A.      Yes.

3           To combat the shortage the sheriff's office

4   has to rely on a contract for temporary nurses that

5   is being paid out of the commissary account.  This is

6   an allowable use for commissary but commissary cannot

7   support this expense for much longer without

8   affecting its ability to cover its other

9   expenditures, maintain the minimum cash balance

10  required by law, and continue to reimburse the

11  general fund, the latter of which has been part of

12  the sheriff's budget plan for years.

13          Do you want me to go on?

14  Q.      Yes, sir.

15  A.      The temporary nurses are earning well over $38

16  an hour which creates a morale issue for our nurses.

17  The ability to pay is there for temporary staff but

18  not our own employees.

19          There are six vacant nurses in the downtown

20  county jail which as of March had an ADP of 2,331.

21  The jail is rated for approximately 1700.  It's

22  overcrowded.  Prisoners are sleeping on mats on the

23  floor and our population is disproportionately

24  unhealthy.  A shortage of nurses creates risk.  The

25  county settles a lot of medical-related lawsuits, the

1 most significant of course was the Levert death.

2 There are four vacant nursing positions in the

3 Bedford Jail which is impeding our ability to utilize

4 the facility, generate revenue and most importantly

5 maximize the availability of services for eligible

6 inmates.

7      Bedford was built for 200 inmates and there

8 are only 20 in there now, without a nurse, which I'm

9 certain -- I'm not certain complies with ACA

10 guidelines.  An advantage of the Euclid and Bedford

11 facilities is the ability to segregate prisoners.

12 Data show that keeping the low level offenders

13 separate decreases recidivism rates.  We're not able

14 to follow that best practice now despite having spent

15 nearly 400,000 renovating that facility.

16      Raising the wages of our nurses to $38 and

17 hour would cost -- at full staffing would cost

18 $400,000 but ultimately would be less expensive

19 because we would decrease turnover, save on training

20 costs, saving on the temporary nurses that earn more

21 than $50 an hour, and minimize our risk and

22 liability.

23      If there's anything OBM can do to help and

24 address this issue please let me know.  In the

25 meantime our revenue estimates are falling way short

1  of the budget and short of the revised estimates

2  based on the delay.

3  Q.    Who sent that?

4  A.    Well, the person who sent the e-mail was

5  Maggie Keenan.

6  Q.    And what was Maggie Keenan's jobs within the

7  county?

8  A.    She was the director of the budget.

9  Q.    What does the director of the budget do?

10  A.    She put the budget together working with the

11  county executive and also with county council.

12  Q.    Okay.  I'm going to show you what's been

13  previously marked as State's Exhibit 106, Bates stamp

14  443.  Do you recognize what I've shown you, sir?

15  A.    Yes.

16  Q.    Is that a -- is that a response to the

17  previous e-mail that we just saw?

18  A.    Yes.  Apparently I did respond to that e-mail.

19  Q.    What's the date of the response?

20  A.    Wednesday, April 18th, 2018.

21  Q.    What was your response to Miss Keenan?

22  A.    Thanks, Maggie, for the heads up.

23  Q.    Now, this is April of 2018.  Did an event

24  happen in May of 2018?

25  A.    Yes.

1   to go back to those same points.  But the next day

2   after that occurred, what did you do, the next day?

3   A.    Well, I have to give a little background.  At

4   that hearing Gary Brack, who was the head nurse from

5   Metro gave some testimony and the testimony -- excuse

6   me.  He made some statements and the statements among

7   other things talked about a number of things, and

8   about issues of nurse staffing.  But he also made a

9   very strong personal, negative, subjective, verbal

10   attack on Ken Mills.  He called him an

11   obstructionist.  He said he was involved in

12   passive/aggressive behavior.  He said nothing he says

13   pans out.  He said he walks around with an imagined

14   authority and he says you should see him when he's at

15   meetings with the sheriff, he rolls his eyes, shows

16   disrespect like I've never seen.

17        So after that I had a discussion with the

18   county executive.  He decided to call Metro.  He did

19   not feel this was a very healthy working situation

20   where Mr. Brack was so hostile to Mr. Mills and asked

21   for a meeting the next day to see if Mr. Brack might

22   be reassigned.  And so I went with the county

23   executive to that meeting which was the next day.

24   Q.    Well, you say, see if he might be reassigned.

25   Is that what we're talking about here?  Or was it

```
 1   presented a different way?
 2   A.     He asked at the meeting if -- he asked at the
 3   meeting that Mr. Brack be reassigned.
 4   Q.     And at the meeting with whom, sir?
 5   A.     At the meeting -- the meeting was with
 6   Jane Platten, Dr. Akram Boutros, myself and also
 7   Armond Budish, the county executive.
 8   Q.     Okay.  And at the meeting who was talking?
 9   A.     Well, Mr. Budish talked initially and to the
10   best of my recollection explained the problem.  There
11   was a discussion about the hearing.  Then he asked me
12   to speak as to what had happened at the hearing,
13   which I did.  And then Dr. Boutros asked if -- asked
14   Mr. Budish if he was seeking to have Mr. Brack
15   reassigned.  Mr. Budish said, consider it asked.  And
16   Dr. Boutros said he would grant the request.
17          Before that he asked how Cuyahoga County
18   Council would react to all this and Mr. Budish said,
19   no, this is the right thing to do, or words to that
20   effect, and went ahead.
21   Q.     So sir, based on that meeting then what
22   happened to Mr. Brack?
23   A.     There was an e-mail sent some time after that
24   indicating that Mr. Brack had been reassigned.  Or
25   Mr. Brack was going through the process of being
```

1  reassigned but there was somebody else that would be

2  replacing him in that particular position.

3  Q.    Was he removed from the jail?  That's what I'm

4  asking.

5  A.    He was taken out of the position that he had

6  been in at the jail, correct.

7  Q.    So he was removed from the jail?

8  A.    Yes.  He was taken out of that position.

9  Q.    Now, after that hearing did you or Mr. Budish

10  undertake to determine whether the things that

11  Mr. Brack was saying at the hearing were true or not?

12  Was there any investigation done by you or your staff

13  to investigate what Mr. Brack was saying at the

14  hearing?

15  A.    The primary concern was with the process, the

16  whole process --

17              MR. MEYER:  Your Honor, I would ask

18        the witness --

19              THE COURT:  Hold on.  Rephrase your

20        question.  If you can just answer it yes or

21        no.  And then --

22  Q.    Yes or no, sir:  Did you investigate to find

23  out if what Mr. Brack said was true?

24  A.    Yes.  We investigated to determine whether or

25  not there were problems in the jail with respect to

the nurse staffing issue.

          MR. MEYER:  May we approach, your
Honor?

          THE COURT:  I suppose.  Yes.

               - - - -

          (Thereupon, a discussion was had
between court and counsel at sidebar off the
record.)

               - - - -

Q.    Mr. Leiken, you recall speaking with law
enforcement in this case, don't you?

A.    Yes.

Q.    And you recall that you signed a proffer
agreement?

A.    Yes.

Q.    And a proffer agreement allows you to speak
with law enforcement provided that you make truthful
statements, correct?

A.    Yes.

Q.    And if you make truthful statements under that
proffer agreement those statements cannot be used
against you, correct?

A.    Correct.

Q.    And you've previously informed law enforcement
or told law enforcement that you did not investigate,

```
 1    yourself, those allegations that Mr. Brack made at
 2    that hearing, haven't you?
 3                    MR. SPELLACY:  Objection.
 4    A.    Okay.  I'm sorry.  Because I misunderstood
 5    what you were asking.
 6                    THE COURT:  Overruled.  Go ahead and
 7           answer.
 8    A.    Okay.  I -- I didn't personally do an
 9    investigation.  I thought what we were talking about
10    was whether I had looked at some e-mails.
11    Q.    I'll ask you about a later investigation.  But
12    I'm talking about your own response to that hearing
13    in May.
14    A.    Yeah.  Yes.  Do an investigation?  No.
15    Q.    So you would have no basis to know whether in
16    fact Mr. Mills was disrespectful to the sheriff?
17    A.    As far as --
18    Q.    No personal knowledge of that?
19                    THE COURT:  You only know what you
20           heard Mr. Brack say in the hearing.
21                    THE WITNESS: I'm sorry.  I know what
22           I heard.  That's all.  Yes.  I know what I
23           heard.  That's all I knew.
24    Q.    So did there come a time later on after
25    Mr. Brack was removed from the jail that you and/or
```

**PLAINTIFF'S EXHIBIT**

1   towards the front and Mr. Budish's office was in the

2   back, behind me, but not terribly far.

3   Q.      I'm going to show you a document that's been

4   marked as Exhibit 36, Bates stamp 147, and I would

5   ask you to just look at the screen and tell me if you

6   recognize what I've shown you.

7   A.      I do.  It was an e-mail I believe that I sent,

8   probably --

9   Q.      Is there a date that indicates when you sent

10  the e-mail?

11  A.      Looks like February 3, 2017.

12  Q.      Could you read the e-mail that you sent?

13  A.      Sure.  And I believe it was sent to the

14  executive.

15  Q.      Okay.

16  A.      Good first meeting yesterday with Judge Mary

17  Kay Bozza at Lyndhurst Court.  Walked her through

18  procedures of taking Richmond Heights inmates.  Mayor

19  Roche was there with his chief.  Richmond Heights

20  planning to shut their jail and transport prisoners

21  to Euclid.  This could be start of true jail

22  regionalization.  Once completed then they will move

23  to regional dispatch center.  Thanks to Ken Mills and

24  the warden for explaining the process.

25  Q.      After you sent that to the

1  Executive Armond Budish did Mr. Budish respond to

2  your e-mail?

3  A.     I believe with a one sentence.  Correct.

4  Q.     And did he include people in the response

5  besides yourself?

6  A.     He included Randy Carney, Frank Bova.  Frank

7  was the chief at the time.  And Ken Mills.

8  Q.     And what was Brandy Carney?

9  A.     That's a good question.  She was under

10 Mr. Bova doing various public safety initiatives.

11 Q.     And what was the text of Mr. Budish's e-mail

12 to you and those individuals?

13 A.     Please make sure they understand $99.

14 Q.     And do you understand the statement that was

15 made?  Have you seen that statement before or were

16 you familiar with it?

17 A.     I was.

18 Q.     And tell us how.

19 A.     That was his direction that the cities would

20 pay $99 per day per prisoner if they were going to

21 participate in a regional jail operation and I

22 believe this one specifically mentions the City of

23 Euclid.

24 Q.     Okay.  And did Mr. Budish include the sheriff

25 on that e-mail?

1  Q.      Could you read, starting at the top -- well,

2  before I ask you that, do you know the date this

3  letter was sent?

4  A.      There's no date on it but we were able to --

5  because we stamped the letter in our correspondence

6  file that it was sent on November 8th, 2018.

7  Q.      All right.  Thank you.  And could you read

8  the text of the letter to us please.

9  A.      Dear Executive Budish:  The judges of the

10  Cuyahoga County Court of Common Pleas General

11  Division are concerned with conditions in the

12  Cuyahoga County Corrections Center, parentheses

13  county jail.  Recent news reports -- there's

14  redaction.  The county's indifference to the dangers

15  created by failing to meet the needs of the very

16  fragile and volatile prison population must end.  It

17  is imperative that you and your county leaders

18  respond in a timely manner to these concerns.

19        The health and the safety of those in the

20  county jail is the county's responsibility.  The

21  court is not responsible for the operations of the

22  county jail but we cannot ignore the effect of

23  current conditions upon incarcerated individuals.

24  The judges of this court can no longer rely on

25  statements made by those you have chosen to operate



PLAINTIFF'S
EXHIBIT
6

Jackson v. Cuyahoga County, et al. (1:20-cv-02649)          County 0000907

1 the county jail that much needed change is coming.

2     Shortage of staffing in the jail contributes

3 to a lack of identification of people who need

4 medical and psychiatric care upon booking.  Inmates

5 wait as long as four weeks to see medical and

6 psychiatric staff and even longer for necessary

7 prescriptions.  Delayed medication results in

8 decompensation and increased psychotic episodes.

9 In addition, due to their deteriorating medical

10 condition defendants often require referral at a

11 significant cost for restoration to competency.

12     On behalf of the judges, as administrative

13 judge, I've repeatedly expressed concerns regarding

14 the policies and procedures including the medical

15 care of the jail.  We ask that you take appropriate

16 steps following the current county and FBI

17 investigations to ensure the safety of the county

18 jail population and employees.

19     The judges of the court cannot have a

20 discussion regarding the safety within the jail

21 without raising serious concerns about the safety

22 within the Justice Center.  Again, I have brought

23 security issues in the Justice Center to the desks of

24 two county executives, you and Ed Fitzgerald, and

25 three sheriffs, Robert Reid, Frank Bova and Cliff

1  Pinkney.   The safety and welfare of the court and the

2  sheriff's department staff, clients, attorneys and

3  public who appear in our courtrooms have to be

4  improved and maintained.

5      The lack of sheriff's deputies or the security

6  personnel on the courtroom floors of the Justice

7  Center has been a concern for years.   This leaves

8  people in the courtrooms where emotions and tensions

9  run high at the greatest risk of danger.   However,

10  every day that -- I'm sorry.   There's a redaction in

11  there.   However, every day that we delay is a cause

12  for concern.

13      The sheriff deputies on court floors are hard

14  working employees.   Still, the lack of deputies to

15  escort defendants from the jail to the courtrooms and

16  provide security for hearings delays justice.

17      We have repeatedly tried to bring these issues

18  to the county and remain willing to work with you on

19  potential resolutions.   We hope the county is not

20  putting a price on the safety of its citizens.

21      Sincerely, John J. Russo, administrative and

22  presiding judge.

23      Then the letter was copied to all of the 34

24  judges of the Common Pleas Court, myself, council

25  president Dan Brady, Sheriff Clifford Pinkney and

                    MR. MCDONNELL:  Objection.

                    THE COURT:  All right.  The answer
          can stand.  Keep going.

Q.      We've seen e-mails during the course of our
time together today from a little over a year prior
where you and the defendant were talking together and
in fact exchanging e-mails about whether the nurses
should get hired.  Do you remember those?

A.      Yes.

Q.      So if you sent those e-mails back in March of
'17, why in April, '17 did you send this e-mail?

A.      Well, in March of 2017 the information that I
had available to me, which included payroll data but
also largely from Ken, was that we did not have an
issue relative to nursing in the jails.  And I -- I
mean, I try to gain competence in other areas of the
county but I have to trust the directors to know
what's best so I, to the extend possible, I really
tried to take them as the experts.

          In April of 2018 there was absolutely no
denying that we were in crisis.

                    MR. MCDONNELL:  Objection.

                    THE COURT:  Overruled.

Q.      Explain your answer.

A.      So we were burning through the temporary



17:11:49

17:12:02

17:12:25

17:12:42

17:12:52

```
 1   A.     Yes.
 2   Q.     Okay.  I'm going to show you a document that's
 3   been marked previously as State's Exhibit 105.  And
 4   Bates stamp 442.  It's going to be on your screen
 5   there and I'll ask you take a look at what you've got
 6   on your screen.  I'll make it a little bit bigger
 7   just so you can see.  Do you see what I've got there?
 8   A.     Yes.
 9   Q.     What do I have on the screen there in front of
10   you?
11   A.     That looks like an e-mail from Maggie Keenan
12   to Armond Budish, Dennis Kennedy and Earl Leiken
13   dated Wednesday, April 18th, 2018.
14   Q.     So is that an e-mail?
15   A.     It looks like an e-mail.  It's a document.
16   Q.     Did you receive e-mails during your time as
17   chief of staff for Cuyahoga County?
18   A.     Yes, I did receive e-mails.
19   Q.     And this particular e-mail, was it sent to
20   you?
21   A.     I don't recall receiving this e-mail.  I don't
22   deny that it was sent to me but I don't recall it.
23   Q.     Okay.
24   A.     It was shortly after I had started with the
25   county and I was getting all kinds of information.
```



Jackson v. Cuyahoga County, et al. (1:20-cv-02649)        County 0000193

Q.      In your capacity as chief of staff did you
send and receive e-mails conducting the county's
regular business?

A.      Yes.

Q.      And did the county's e-mail system preserve
those e-mails to your knowledge?

A.      To my knowledge, yes.

Q.      Have you since seen copies of e-mails that
were preserved on the county system?

A.      Yes.

Q.      Is that one of them that you've seen?

A.      This has been shown to me, yes.

Q.      Okay.  Could you please read the e-mail to us
starting at the top.

                    MR. SPELLACY:  Objection.

                    THE COURT:  Overruled.

A.      I want to make you aware of a critical
situation in the county jail regarding nurses.  At
present there are ten vacancies which is a third of
total staffing levels.  The sheriff's office has been
trying to fill but is having difficulty attracting
candidates due to the low wage.  Starting nurses in
the jail earn $28 an hour.  The industry standard is
$38 an hour.

Q.      Could you just speak up so everybody can hear

1  you as you are reading it please.

2  A.    Yes.

3        To combat the shortage the sheriff's office

4  has to rely on a contract for temporary nurses that

5  is being paid out of the commissary account.  This is

6  an allowable use for commissary but commissary cannot

7  support this expense for much longer without

8  affecting its ability to cover its other

9  expenditures, maintain the minimum cash balance

10  required by law, and continue to reimburse the

11  general fund, the latter of which has been part of

12  the sheriff's budget plan for years.

13        Do you want me to go on?

14  Q.    Yes, sir.

15  A.    The temporary nurses are earning well over $38

16  an hour which creates a morale issue for our nurses.

17  The ability to pay is there for temporary staff but

18  not our own employees.

19        There are six vacant nurses in the downtown

20  county jail which as of March had an ADP of 2,331.

21  The jail is rated for approximately 1700.  It's

22  overcrowded.  Prisoners are sleeping on mats on the

23  floor and our population is disproportionately

24  unhealthy.  A shortage of nurses creates risk.  The

25  county settles a lot of medical-related lawsuits, the

1  most significant of course was the Levert death.

2  There are four vacant nursing positions in the

3  Bedford Jail which is impeding our ability to utilize

4  the facility, generate revenue and most importantly

5  maximize the availability of services for eligible

6  inmates.

7       Bedford was built for 200 inmates and there

8  are only 20 in there now, without a nurse, which I'm

9  certain -- I'm not certain complies with ACA

10  guidelines.  An advantage of the Euclid and Bedford

11  facilities is the ability to segregate prisoners.

12  Data show that keeping the low level offenders

13  separate decreases recidivism rates.  We're not able

14  to follow that best practice now despite having spent

15  nearly 400,000 renovating that facility.

16       Raising the wages of our nurses to $38 and

17  hour would cost -- at full staffing would cost

18  $400,000 but ultimately would be less expensive

19  because we would decrease turnover, save on training

20  costs, saving on the temporary nurses that earn more

21  than $50 an hour, and minimize our risk and

22  liability.

23       If there's anything OBM can do to help and

24  address this issue please let me know.  In the

25  meantime our revenue estimates are falling way short

1    of the budget and short of the revised estimates

2    based on the delay.

3    Q.      Who sent that?

4    A.      Well, the person who sent the e-mail was

5    Maggie Keenan.

6    Q.      And what was Maggie Keenan's jobs within the

7    county?

8    A.      She was the director of the budget.

9    Q.      What does the director of the budget do?

10   A.      She put the budget together working with the

11   county executive and also with county council.

12   Q.      Okay.  I'm going to show you what's been

13   previously marked as State's Exhibit 106, Bates stamp

14   443.  Do you recognize what I've shown you, sir?

15   A.      Yes.

16   Q.      Is that a -- is that a response to the

17   previous e-mail that we just saw?

18   A.      Yes.  Apparently I did respond to that e-mail.

19   Q.      What's the date of the response?

20   A.      Wednesday, April 18th, 2018.

21   Q.      What was your response to Miss Keenan?

22   A.      Thanks, Maggie, for the heads up.

23   Q.      Now, this is April of 2018.  Did an event

24   happen in May of 2018?

25   A.      Yes.