IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TABATHA JACKSON, *et al.* | ) | CASE NO. 1:20-CV-02649 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| CUYAHOGA COUNTY, OHIO, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITON TO DEFENDANT CUYAHOGA COUNTY'S MOTION FOR SUMMARY JUDGMENT**

Now come the Plaintiffs Tabatha Jackson and Phyllis Davis ("Plaintiffs"), by and through undersigned counsel, and hereby respectfully request that this Honorable Court deny Defendant Cuyahoga County's ("Defendant") Motion for Summary Judgment.

**I. STATEMENT OF FACTS**

*A. Tabatha Jackson.*

Tabatha Jackson was born in Cleveland, Ohio on June 26, 1967. (Jackson Dep. at 21, 23.) She grew up in the Glenville neighborhood and has lived in the Cleveland area for most of her life. (*Id*. at 23.) Jackson had a difficult upbringing growing up on Cleveland's East Side, having lost her parents and thirteen brothers and sisters. (*Id*. at 47.) Recently, Jackson has worked at Edwins Leadership & Restaurant in Shaker Square and is in school. (*Id*. at 193.)

Prior to her confinement in the Cuyahoga County Corrections Center ("CCCC"), Jackson was shot three times in the Buckeye-Woodhill neighborhood—in her stomach,

1

back, and hands. (*Id*. at 35.) She needed surgery to treat the gunshot wounds and required a wheelchair to ambulate. (*Id*. at 51–52.) "I have sciatica and neuropathy. I sometimes could feel my right leg and sometimes I can't. Neuropathy seems like I'm walking on billions and billions of pins, and it won't allow me to put my foot all the way down without falling." (*Id*. at 57.) During her entire stay at CCCC, Jackson's gunshot wounds bled "[b]ecause I had staples in my stomach. I had stitches. It just kept bleeding." (*Id*. at 63–4; *see* 130.)

Notwithstanding Jackson's poor physical condition, the County placed her in general population, instead of in a medical pod, without a wheelchair. (*Id*. at 53, 59–60, 63, 65–66, 73.) As a result, Jackson "kept falling[]" "every day" (*Id*. at 67, 73.) Defendant Randy Pritchett knew that Jackson required a wheelchair due to her physical condition. (*Id*. at 54.) Jackson served time in CCCC for 10 months straight, from July 2018 to May 2019. (*Id*. at 130.)

Due to overcrowding and understaffing in CCCC, Jackson was forced to sleep in "noisy" conditions on a "filthy" thin white mat that was placed on the floor of CCCC. (*Id*. at 89; *see* 128–35, 137–38.) The mat was unsanitized and had "bugs in them. You sleeping on women's menstrual cycle". (*Id*. at 89.) "I couldn't sleep. I had staples in my stomach. My back was bandaged up. I couldn't even get up off the floor. I couldn't [] [] try to walk." (*Id*. at 67, 89.)

Jackson was confined to her cell for nearly twenty-four hours a day due to a County policy called "red zoning." (*Id*. at 90, 130, 138.) "[B]y us being in red zone, you got no w[here] to throw your trash," so female inmates flushed tampons and menstrual

2

pads down the toilets, causing them to clog and overflow with urine and feces. (*Id*. at 145–46.) Jackson had to remain in the unsanitary cell: "We locked down with it. We smell of it." (*Id*. at 149.) The lingering stench caused Jackson to suffer severe emotional distress. (*Id*. at 154.) Very often, correction officers came and searched Jackson's cell, sometimes in the middle of the night. (*Id*. at 139.) The County was aware that it was "red zoning" Jackson in appalling conditions of confinement.

Jackson deposed: "Q. Do you think that this odor was related to the red zoning, like the feces and urine themselves? A. Yeah. You can't get out [of the cell] to do nothing." (*Id*. at 150–51.) "Q. You couldn't access the shower while it was on red zone? A. No, you cannot. If it's red zone for five days, five days you just stank." (*Id*. at 151.) The drains were clogged in the showers, so "the water come up to your ankle. And then you got bugs, hair, little creepy crawlers coming up out the drain." (*Id*. at 149.) Additionally, "you have bugs everywhere in your unit[,]" including cockroaches, little black bugs that are a "pest," and they fly around. (*Id*. at 155, 184.)

The County served Jackson food that had "[l]ittle black bugs[]" in it. (*Id*. at 156.) "You got really little bugs, and then they start moving around in your food, little bugs. The you got big bugs. I have no idea where these bugs be coming from, but you got big bugs in the cells." (*Id*. at 156; *see* 157–58.) Jackson was also served spoiled meat. (*Id*. at 160–61.) "Q. How do you know it was spoiled? A. You can smell it." (*Id*. at 161.) Jackson became physically ill with food poisoning and vomited from the food that the County served her. (*Id*. at 162–65; *see* 192.) "I ate spoiled food and food with bugs in it. I wrote a kite because I wasn't feeling good." (*Id*. at 82.) The County served food on "old trays with

3

mold in them." (*Id*. at 170.) "You can smell the trays. . . . And then, like, if you put your food on top of it and it's spoiled, that's a stinky combination I'm sorry to tell you. I can't describe the smell, but that's not a good combination of a smell." (*Id*. at 178–79.)

"Another reason why they took my wheelchair is because I spoke on something. . . . I woke up in[] a room that had feces and urine from the toilet all over the floor. And they left me in that room, me and my little wheelchair. I couldn't get up. So I'm stuck in this room with all—somebody's human waste. And the toilet exploded. It exploded on me, too, and my wheelchair. So when you go and open your mouth and you go and tell and you go and talk, do you know those people don't like that? So they take your stuff away and put you out there in general population where you can fall. . . . [T]hey took a dump on me." (*Id*. at 83–84, 88.) After the "nasty fountain" shot out of the toilet, the entire pod was evacuated, except for Jackson, who was left behind and could not get up off the feces laden floor. (*Id*. at 88.) Jackson "kept throwing up[]" and could not eat because of the lingering stench; particles were "on [Jackson's] person, my body, my hair." (*Id*. at 86–87.)

Additionally, the County failed to provide Jackson with clean drinking water during her incarceration at CCCC. (*Id*. at 174.) "I had to drink water that was brown with rust. . . . And even if you let [the faucet in the cell] run, it [still] be rusty." (*Id*. at 171.) This is the water the County gave Jackson to drink when she was "red zoned." (*Id*. at 171–72.) When Jackson shared a cell with Plaintiff Phyllis Davis during "red zone," the sink in their cell did not work, preventing them from even drinking rusty water. (*Id*. at 172; *see* 175.) Jackson was "dehydrated" due to "red zoning" and unable to take her medication

4

to treat her gunshot wounds without water. (*Id*. at 173–74.) This caused her to be in a lot of pain. (*Id*. at 173.)

### B. Phyllis Davis.

Phyllis Davis[1] was born in Cleveland, Ohio on May 22, 1962. (Davis Dep. at 7.) She has always lived in the Cleveland area. (*Id*. at 8.) While Davis was detained in CCCC, she, like Jackson, had to sleep on a two-inch-thick mat that the County had placed on the jail floor. (*Id*. at 47–48.) Due to the County's "red zone" lockdown policy, Davis had to be on her mat for twenty-two to twenty-three hours a day. (*Id*. at 92–93.) "I think it's inhuman[ane] to have somebody on a mat for 22, 23 hours out of a day. Q. But, I mean, you could kind of get up and walk around if you wanted to, right, in the day room? A. No . . . . most of the time, there was a staffing issue . . . so they just made you stay in the cell or on the mat." (*Id*. at 92.) "Red zone" happened in general population and in the medical pod due to overcrowding and understaffing in CCCC. (*Id*. at 93, 123.)

Due to "red zoning," Davis was confined to a mat that was right outside of the bathroom, and there was a constant smell of urine and feces emanating toward her. (*Id*. at 100–01.) There was also a plumbing problem: the toilet nearby was backed up and overflowed with urine and feces. (*Id*. at 100–01.) "And then the bugs in the shower that wouldn't go down the hole because the bugs were too big . . . so you would be standing in this water[]" during a shower. (*Id*. at 101.) "There were bugs in the food also." (*Id*. at 102.) The drinking water had the same "yellowish tinge, so you couldn't drink it." (*Id*. at

---

[1] Davis was prescribed alprazolam, a generic form of Xanax, but she was never given this medication while at CCCC. (Davis Dep. at 44–47; *see* Davis's Dave's Pharmacy Records, Doc. #: 53-2.) This caused her to suffer a seizure and bite through her tongue. (*Id*. at 49.)

5

102.) Davis saw bugs crawling around the pod and she had to "keep [her] towel over [her] head at night so they wouldn't get in my ears." (*Id*. at 103.) The County served Davis spoiled "green hot dogs" and "oatmeal with meal bugs" on trays with "cracks and crevices with mold in them." (*Id*. at 106, 108–09.)

### C. The County's "Red Zoning" Policy Caused the Unconstitutional Conditions of Confinement for Jackson and Davis.

Charles Enoch testified that in 2018, when both Jackson and Davis were at CCCC, the jail was overcrowded and understaffed. (Sept. 3, 2021 Trial Test. of Charles Enoch at 12:21–13:13.) Marcus Harris testified that "[r]ed zoning is the most dangerous thing you can ever do. It's taking one officer and having them supervise two areas in the facility. . . . one officer would be watching up to 100 inmates at one time by themselves in two different housing units." (Sept. 3, 2021 Trial Test. of Marcus Harris at 40:12–42:6.) Harris testified that the "red zoning" policy was a "staffing tool[]" for the County because it was housing 2400 inmates when CCCC's statutory capacity was 1700. (*Id*. at 44:21–5; 45:11–46:21.)

FBI agent Daniel Eyer began investigating CCCC "in the summer of 2018", right before Jackson and Davis arrived. (Sept. 2, 2021 Trial Test. of Daniel Eyer at 3:25–5:9.) Eyer specifically investigated the County's "red zoning" policy:

> So red zoning, that's not an official term. A term that's commonly referred to in the jail though, referred to the locking down of inmates within their cells. See, normally inmates at the jail would be able to move freely during certain parts of the day to get out of their small cells where they sleep. Red zoning refers to when the inmates are all locked into their cells and they cannot move throughout the jail.
>
> As part of a corruption investigation, or in this case, civil rights of the inmates, locking the inmates into their cell was a potential

6

> violation of civil rights and that's why we were focused on that aspect.

(*Id.* at 5:10–6:15.) From 2014 until 2018, the County employed the "red zone" policy 356 days of the year. (*Id.* at 7:7–9:16.) In 2018 alone, when both Jackson and Davis were at CCCC, "there were 2,797 instances of red zoning." (*Id.* at 12:4–17.) "Red zoning" reached its highest levels in 2018, when both Jackson and Davis were at CCCC. (*Id.* at 23:10–23.)

> Further,
>
> Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone". The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;
>
> Refusal to install shower curtains for detainees/inmates housed in the "Red Zone" RHU, detainees/inmates are afforded not privacy when they are eventually allowed to take a shower; during showering detainees are in full view of any staff, or detainees in the shower area, as well as visible through narrow oblong windows which look directly into the showering area from the common access hallway; [and]
>
> \* \* \*
>
> Detainee/inmate court meals were not properly refrigerated or stored and were found placed in an unused office area which reeked of dead vermin[.]

(Nov. 21, 2018 U.S. Marshals Service Report at 4–5.)

Mark Thevenin testified that the County's Regionalization policy caused overcrowding in CCCC, which caused the County to use the "red zone" policy:

> Q. And did it happen? Did the county start taking all those Cleveland inmates?

7

> A. Yes, it did. Regionalization did go into effect.
>
> Q. What was the result from your perspective?
>
> A. We had mass overcrowding then.

(Aug. 31, 2021 Trial Test. of Mark Thevenin at 10:14–12:5.) Pre-Regionalization, "red zoning" happened a "few times a year." (Aug. 31, 2021 Trial Test. of Timothy Dugan at 56:6–57:25.) Through its regionalization plan, the County's intent was to make money from operating CCCC by charging "$99 per day per prisoner." (Doc. #: 40-1.) This lead directly to the "red zoning" Jackson and Davis experienced.

## II. LAW AND ARGUMENT

The Eighth Amendment can be violated by conditions of confinement in a jail when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results "in the denial of the minimal civilized measure of life's necessities," and (2) where prison officials are deliberately indifferent to this state of affairs. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference "may be infer[red] from circumstantial evidence," including "the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Recently, in *Taylor v. Riojas*, S. Ct. 52, 53 (2020), the Supreme Court affirmed that Taylor's conditions of confinement violated the Eighth Amendment's prohibition on cruel and unusual punishment, and reversed the Fifth Circuit's grant of qualified immunity.[2] In a *per curiam* opinion, the Court held that correction officers were not

---

[2] *See Jackson v. Duckworth*, 955 F.2d 21 (7th Cir. 1992) (Posner, J.): "The prisoner's affidavit states that he was forced to live with 'fifth, leaking and inadequate plumbing, roaches,

8

entitled to qualified immunity because the conditions of confinement were so horrific that any reasonable officer should have known they were unconstitutional: "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time [six days]."

Like Jackson and Davis here, who were both in filthy conditions for more than six days, Taylor was locked down in his cell **for six days** "in a pair of shockingly unsanitary cells." *Id*. at 53. The first cell was covered in feces and his food and water were contaminated due to the conditions. *Id*. In the second cell, his toilet overflowed, and "raw sewage" spilled across the floor of the cell where he had to sleep. *Id*. *Riojas* was the first time the Court overturned a grant of qualified immunity based on the obviousness of the constitutional violation. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*).

---

rodents, the constant smell of human, waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, [and] . . . drinking water contain[ing] small black worms which would eventually turn into small black files.' The defendants have presented sworn denials of these conditions, but summary judgment is not a procedure for resolving a swearing contest. [] The district judge said that 'Mr. Jackson has failed to come forth with evidence to show a genuine issue of material fact as to whether he has endured violated the Eight Amendment.' But an affidavit is evidence for purposes of determining whether a genuine issue of material fact exists. Fed.R.Civ.P. 56(c). And while the judge seems to have been displeased with what he called the 'general' character of Jackson's allegation's in fact, the affidavit sets forth the allegedly barbarous conditions of his confinement in rather excruciating detail."

9

The "red zone" policy was the cause of Jackson and Davis's unconstitutional conditions of confinement because it caused them both to be locked down in conditions littered with urine and feces and the horrid stench of it. (Jackson Dep. at 150–51; Davis Dep. at 100–01.) "We locked down with it. We smell of it." (Jackson Dep. at 149.) Jackson testified that the "red zone" policy caused female inmates to flush their feminine products down toilets in the cells, causing them to back-up, reek, and overflow. (*Id*. at 145–46.) Like *Riojas*, *supra*, the County locked Jackson in a filthy cell for nearly twenty-four hours a day due to a County policy called "red zoning." (*Id*. at 90, 130, 138.)

Davis was also "red zoned" but to a mat that was right outside of a bathroom, and there was a constant smell of urine and feces emanating toward her mat, where she was locked down. (Davis Dep. at 100–01.) The toilet in the bathroom was clogged and overflowed with urine and feces—right by the mat where Davis was confined for "22, 23 hours out of a day." (*Id*. at 92, 100–01.) Under oath, Adam Chaloupka testified:

> Q. Is there anything that you observed in the period of 2018 from your standpoint within your job that the Cuyahoga County Jail was doing that was a serious problem compared to other jails?
>
> A. Inmates on the floor.
>
> Q. Crowding?
>
> A. Overcrowding. We did not have those—I did not observe those kind of conditions in either Lake County or Trumbull County.

(Sept. 1, 2021 Trial Test. of Adam Chaloupka at 92:5–23.)

CCCC stunk of human waste and Jackson and Davis were locked down in it. *Vinning-El v. Long*, 482 F.3d 923, 923–24 (7th Cir.2007) (summary judgment in prison's favor reversed where prisoner was placed in a cell with blood and feces on the walls,

10

without running water or sanitation supplies); *Johnson v. Pelker*, 891 F.2d 136, 139–40 (7th Cir.1989) (reversing summary judgment for prison where prisoner's cell was smeared with feces and he was denied water and cleaning supplies). Jackson deposed: "Q. Do you think that this odor was related to the red zoning, like the feces and urine themselves? A. Yeah. You can't get out [of the cell] to do nothing." (Jackson Dep. at 150–51.) "Q. You couldn't access the shower while it was on red zone? A. No, you cannot. If it's red zone for five days, five days you just stank." (*Id*. at 151.)

The U.S. Marshals Service corroborated Jackson and Davis's accounts during its investigation:

> Review of the CCCCs annual staffing analysis reveal essential posts and positions are not identified; currently, there are 96 correctional officer vacancies. As a result of a high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding providing for detainees'/inmate's basic needs. To address staffing shortages and call outs CCCC implemented a "Red Zone" system whereby detainees/inmates are confined to their cells for periods of 27+ hours and not let out during times they normally have access to dayrooms, showers, telephones and outside recreation areas. A housing unit log book and detainee/inmate interviews indicate the "Red Zone" system was in effect in one housing unit for 12 days in a row. CCCC does not have a policy or written directive outlining specific procedures for the "Red Zone" system.

(Nov. 21, 2018 U.S. Marshals Service Report at 28.)

In determining whether filth and infestation comparable to that which Jackson and Davis experienced would be enough to prove an Eighth Amendment violation, the following should be considered:

> Depending on how extensive the infestation of a prisoner's cell is, what the infesting pests are, what odors or bites or risk of disease they create, what particular psychological sensitivities the prisoner was known to have . . . and how long the infestation continues, a trier of fact might reasonably conclude that the prisoner had been subjected to harm

11

>sufficient to support a claim of cruel and unusual punishment even if he had not contracted a disease or suffered any physical pain.

*Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir.2012). "The potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Id*. at 615.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, *cf. Hall* 118 (cautioning against "confusing a mental state with the proof of its existence"), and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

The County's awareness of the substantial risks that the conditions posed to Jackson and Davis cannot reasonably be disputed. Indeed, correction officers came very often and searched Jackson's cell, sometimes in the middle of the night. (Jackson Dep. at 139.) When viewing the facts in the light most favorable to Jackson and when construing all reasonable inferences in her favor, the Court should find that the County was aware that its "red zoning" policy was causing Jackson to be confined in utterly appalling conditions. After the "nasty fountain" shot out of the toilet upon Jackson, the entire pod was evacuated, except for Jackson, who was left behind, unable to physically get up off the feces-laden floor. (*Id*. at 88.)  Jackson "kept throwing up[]" and could not eat because of the lingering stench; particles were "on [Jackson's] person, my body, my hair." (*Id*. at 86–87.) Further, CCCC work orders indicate that the plumbing in Jackson's pod was woefully inadequate:

| **Earliest Date Listed** | **Description** | **Last Date Listed** |
|---|---|---|
| 12/31/2018 | "Toilet in 2B#8 is clogged" | 1/18/2019 |

12

| | | |
|---|---|---|
| 12/31/2018 | "Toilet in 2B#9 will not flush" | 1/18/2019 |
| 1/8/2019 | "Pod 2b2 day room shower clogged" | 1/22/2019 |
| 1/24/2019 | "pod B2 - water runs constant" | 3/9/2019 |
| 3/4/2019 | "Pod B2, Cell 3, Toilet clogged" | 3/20/2019 |
| 3/8/2019 | "Pod B2, Cell 4, No hot water" | 3/20/2019 |
| 5/13/2019 | "Pod B2, Light out in day area" | 5/29/2019 |

(Excerpts from CCCC Work Order Spreadsheet.)

Davis was not in a cell but for one day with Jackson; her mat was in a heavy-foot-traffic, common area right outside of the bathroom, which, viewing the facts in the light most favorable to Davis, put the County on notice that she was "red zoned" in sewage and the horrid stench of it. (Davis Dep. at 100–01.) Additionally, under oath, Adam Chaloupka testified:

> Q. Did your union file grievances or make warnings or make statements to jail management including the director Mr. Mills, the defendant, about the overcrowding conditions in 2018?
>
> A. Yes.

(Sept. 1, 2021 Trial Test. of Adam Chaloupka at 74:20–75:13.)

The County was deliberately indifferent to Jackson and Davis's conditions of confinement because the County applied its "red zone" policy to lock them down in conditions with raw sewage. The obvious cruelty inherent in this policy provided the County with notice that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 745 (2002) (holding that "[t]he obvious cruelty inherent" in putting inmates in certain wantonly "degrading and dangerous" situations provides officers "with some notice that their alleged conduct violate[s]" the Eighth Amendment).

13

"With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*.

Jackson and Davis submit that the Eighth Amendment violations here are obvious based on the facts, which must be taken as true at the summary judgment stage. *Spencer v. Bouchard*, No. 05-2562, 2006 U.S. App. Lexis 13846 (6th Cir.) (holding that a pretrial detainee presented a viable claim for deliberate indifference to inadequate shelter in his cell, which was allegedly cold and wet, with rain or snow leaking from the ceiling onto the mattress on the floor where he slept.) Evidence that the County "must have known" about the risk of physical or psychological harm resulting from the unsanitary conditions is sufficient for a jury to find deliberate indifference. *Sanville v. McCaughtry,* 266 F.3d 724, 737 (7th Cir.2001), citing *Farmer*, 511 U.S. at 842–43).

Davis was a pretrial detainee during her confinement at CCCC. (Davis Dep. at 35, 39, 58.) Accordingly, her claim is governed by the Fourteenth Amendment. In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Court held that Fourteenth Amendment claims are required to meet only an objective standard. *See Richmond v. Huq*, 885 F.3d 928, 938 n.4 (6th Cir. 2018) (explaining that *Kingsley* "calls into serious doubt" whether the Fourteenth Amendment requires a subjective prong). But, as explained above, even under the higher,

14

Eighth Amendment standard, the County cannot escape liability on Davis's conditions of confinement claim.

## III. CONCLUSION

Based on the foregoing, the Court should deny the County's Motion for Summary Judgment.

Respectfully submitted,

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)
ZIPKIN WHITING CO., L.P.A.
The Zipkin Whiting Building
3637 Green Road
Beachwood, Ohio 44122
Phone: 216-514-6400
Fax: 216-514-6406
Email: zfwlpa@aol.com
kgross@zipkinwhiting.com

*Counsel for Plaintiffs Tabatha Jackson and Phyllis Davis*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I certify this memorandum complies with the page limit for standard track, as set forth in Local Rule 7.1.

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on March 3, 2023, via the Court's CM/ECF system.

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)