IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TABATHA JACKSON, *et al.* | ) | CASE NO. 1:20-CV-02649 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| CUYAHOGA COUNTY, OHIO, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITON TO DEFENDANT RANDY PRITCHETT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff Tabatha Jackson ("Jackson"), by and through undersigned counsel, and hereby respectfully requests that this Honorable Court deny Defendant Randy Pritchett's ("Pritchett") Motion for Summary Judgment.

**I. STATEMENT OF FACTS**

Tabatha Jackson was born in Cleveland, Ohio on June 26, 1967. (Jackson Dep. at 21, 23.) She grew up in the Glenville neighborhood and has lived in the Cleveland area for most of her life. (*Id*. at 23.) Jackson had a difficult upbringing growing up on Cleveland's East Side, having lost her parents and thirteen brothers and sisters. (*Id*. at 47.) Recently, Jackson has worked at Edwins Leadership & Restaurant in Shaker Square and is in school. (*Id*. at 193.)

Prior to her confinement in the Cuyahoga County Corrections Center ("CCCC"), Jackson was shot three times in the Buckeye-Woodhill neighborhood—in her stomach, back, and hands. (*Id*. at 35.) She needed surgery to treat the gunshot wounds and required

1

a wheelchair to ambulate. (*Id*. at 51–52.) "I have sciatica and neuropathy. I sometimes could feel my right leg and sometimes I can't. Neuropathy seems like I'm walking on billions and billions of pins, and it won't allow me to put my foot all the way down without falling." (*Id*. at 57.) Notwithstanding Jackson's poor physical condition, the County placed her in general population, instead of in a medical pod, without a wheelchair. (*Id*. at 53, 59–60, 63, 65–66, 73.) As a result, Jackson "kept falling[]" "every day" (*Id*. at 67, 73.)

**Defendant Pritchett knew that Jackson required a wheelchair due to her poor physical condition**. (*Id*. at 54.) While Jackson was incarcerated in the CCCC, another inmate "came up with a razor and she's sitting on my left side. At first she up there cutting [her face]." (*Id*. at 97.) "But anyway, I turn to the lady because it was squirting. Something was squirting out of her face. Blood was—I told her don't put no blood on me. So **the lady turned around and she slapped the hell out of me** like a Will Smith to Chris Rock kind of slap." (*Id*. at 98.) "So yes. I defended myself." (*Id*. at 98; 118.)

A female corrections officer came in and separated the razor-wielding inmate from Jackson, **and then remained right by Jackson's side, with her hand on Jackson's arm**: "She came in and she already had me detained. She talking to me. She said, don't get in no more trouble than what you already in. The object is for you to go home. And so I'm— by me talking to her, I'm calm. It don't take much for me to get calm. I don't stay mad at people too long. It's over with." (*Id*. at 100–01.)

Then, like a bat out of hell, Defendant Pritchett stormed into the room: "Sir, I'm going to just tell you, Ms. Brown was right by my side, and the only thing I saw was that

2

big man [Pritchett] coming through that door." (*Id*. at 101.) "He come running in there. He turned around and he picked me up so hard. I was with her. He picked me up so hard and he slammed me on this desk." (*Id*. at 102.) Jackson deposed:

> A. When he ran in, he grabbed me from this way, and he picked me up and slammed me.
>
> Q. He grabs you from the front?
>
> A. Yes.
>
> Q. Is he grabbing your—
>
> A. He got this part and me all in the same motion. Mister, I don't know how to tell you. You just—he just picked me up and he slammed me. He slammed me like I was a man in the streets. He slammed me so hard, Mister, that my staples smashed in. That was part of the pus and the blood that I kept telling you that kept bleeding my whole duration of the stay there. He smashed it in. And that is—all of these staples—I got staples from here, sir, all the way down to my lady parts, and that hurts. Then he turned around and he snatched me from there and he threw me up against the wall.

(*Id*. at 103.) A video camera caught the incident, but "[n]obody seemed to know where that is." (*Id*. at 104.) "[T]hat man hit my head so hard on that wall, this side of my face was swollen." (*Id*. at 104.) Pritchett threw Jackson face-first into a concrete wall. (*Id*. at 104.) "You know the sad part about this thing, had he just walked in there—but he ran— had he walked in there and asked what was going on, he would've found out that I was already detained. No reason to put your hands on me." (*Id*. at 104; *see* 106.)

Pritchett had no reason to use any force under the circumstances. Notwithstanding, he caused Jackson to suffer physical and emotional injuries:

> Q. Where was that pain?
>
> A. Everywhere; my hand –

3

Q. You're going to have to be more specific.

A. Let me finish telling you. So after this—because I'm going to tell you where the pain come in at.

So after he slammed me up against the wall, right, he putting on the handcuffs, he got me up—he's a big dude. He's really big. And he had my arms all the way up—all the way up putting on handcuffs. And he put them on backwards. This whole hand—my hands was swollen. Here you go. Handcuff marks right there. Handcuff marks right there. He turned around and my hands was swollen. They was bleeding. My face hurt. My stomach hurt. It was bleeding from the staples being –

\*   \*   \*

A. Everything. My face, everything. I was in more pain than she was. You get slammed by that man. And I'm sure you know how tall and big he is. And at that particular time I was a hundred and—

Q. There is not a question pending.

A. I was just saying.

Q. I understand.

(*Id.* at 105–07.) Pritchett, who wears one of the County-provided "men in black" "combat uniforms," used force on Jackson was "excessive." (*Id.* at 123.)

The U.S. Marshals Service corroborated Jackson's account during its investigation:

Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., **confrontation avoidance**, UOF team concept, team briefings and debriefings, removing staff involved at the onset of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). **Additionally, video tapes involving UOF are not tagged and labeled as evidence.** Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.). [Redacted.]

4

> Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of the Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black", based on their black para-military uniforms.
>
> During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members direct at detainees/inmates.
>
> SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches", as they escorted them to and from the interview location. The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety.

(Nov. 21, 2018 U.S. Marshals Service Report at 35 (emphasis added).)

## II. LAW & ARGUMENT

Under the version of the facts most favorable to Jackson, she posed no threat whatsoever when Defendant Pritchett suddenly stormed into the room, picked her up and slammed her onto a desk, and then face-first into a concrete wall. Defendant Pritchett had no adequate justification for a use of force in this instance when Jackson was already being calmly detained and controlled by a corrections officer. *See Lawler v. City of Taylor*, 268 F.App'x. 384, 386–388 (6th Cir. 2008) (arrestee tackled during booking after calling officer a "pussy" had clearly established right to be free from use of force where there is no perceived threat); *McGovern v. Lucas County, Ohio*, No. 3:18-CV-2506, 2021 WL 1176737 (N.D. Ohio March 29, 2021) (rejecting argument that use of racial slur by inmate created threat to tank stability that necessitated use of force).

Further, after the two wanton and malicious slams, Defendant Pritchett pulled Jackson's arms up behind her back when she was allowing him to handcuff her; Defendant Pritchett placed the handcuffs on Jackson with such force that Jackson's hands began to swell up, and her wrists began to bleed. (Jackson Dep. at 105–07.) Again, Defendant Pritchett had no adequate justification for this use of force when Jackson was compliant, cooperative, and not resisting detainment.

Accepting the facts in the light most favorable to Jackson, as required for the purpose of summary judgment, the analysis here is simple. Because Jackson did not pose a threat and was not resisting the female officer who had already diffused the situation, the gratuitous use of force by Defendant Pritchett was a clearly established violation of Jackson's constitutional rights.

Indeed, punishment that is without penological justification or involves the unnecessary and wanton infliction of pain violates the Eighth Amendment's proscriptions. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The Eighth Amendment prohibits any punishment that violates civilized standards of decency or involves the "'unnecessary and wanton infliction of pain.'" *Ingraham v. Wright*, 430 U.S. 651, 670 (1977), quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). An Eighth Amendment claim contains both an objective and a subjective component. *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997).

"The objective component requires the 'pain inflicted to be "sufficiently serious"' to offend 'contemporary standards of decency.' *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)); *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992))." *Anderson-Santos v. Kent Cnty.*, No. 1:21-CV-453, 2022 U.S. Dist. LEXIS 238697 at *14–15.

"While the extent of a prisoner's injury is relevant to this inquiry in the sense that it may shed light on the amount of force used, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010). 'Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts.' *Id.* at 38. Thus, '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated . . . whether or not significant injury is evident.' *Hudson*, 503 U.S. at 9." *Anderson-Santos*, 2022 U.S. Dist. LEXIS 238697 at *15.

"The subjective component asks 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' [*Hudson*] at 6-7. In determining whether the use of force is wanton and unnecessary, a court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and any effort made to temper the severity of the forceful response. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 321, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986))." *Anderson-Santos*, 2022 U.S. Dist. LEXIS 238697 at *15.

7

Here, Defendant Pritchett had basis to use force upon Jackson at all. Jackson testified that the female corrections officer separated the razor-wielding inmate from Jackson, and then remained right by Jackson's side, with her hand on Jackson's arm. The situation, in which Jackson was not the aggressor, was fully diffused before Pritchett had arrived. Objectively speaking, this is what Defendant Pritchett should have recognized, but instead he stormed into the room and body-slammed Jackson on a wooden desk, threw her face-first into a concrete wall, and pulled Jackson's arms up behind her back when she was allowing him to handcuff her. (Jackson Dep. at 101–03, 105–07.) "You know the sad part about this thing, had he just walked in there—but he ran—had he walked in there and asked what was going on, he would've found out that I was already detained. No reason to put your hands on me." (*Id.* at 104; *see* 106.)

Notwithstanding the fact that **Defendant Pritchett knew that Jackson required a wheelchair due to her poor physical condition**, and the fact that he is a man who is much bigger and stronger than Jackson, a female, a reasonable jury could find that Defendant Pritchett forcefully, maliciously, and gratuitously used force upon Jackson. (Jackson Dep. at 54; 105–07.)

To establish the subjective component, the plaintiff must demonstrate that the prison official acted wantonly, with deliberate indifference to the plaintiff's serious needs. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The plaintiff must also show that the defendant acted "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). And in *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010), the Supreme Court

8

reaffirmed that the proper focus, when analyzing the subjective component, is not on the degree of injury the plaintiff sustained, but whether the officer applied force for the legitimate purposes of maintaining or restoring order or discipline, or utilized force "maliciously and sadistically to cause harm." (quoting *Hudson*, 503 U.S. at 7).

In *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (emphasis added), the Supreme Court held: "In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. *See Whitley*, *supra*, at 327. **This is true whether or not significant injury is evident.** Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."

### III. CONCLUSION

The Court should deny Summary Judgment because Defendant Pritchett sprinted into the room, picked up and slammed Jackson onto a wooden desk, then slammed her head into a concrete wall, and then forcibly handcuffed her so hard that her hands and wrists were bleeding, and are now permanently scarred. Defendant Pritchett used this force after CO Brown had clearly and fully deescalated the situation, wherein Jackson was attached by a razor-wielding inmate. Simply put, Defendant Pritchett had no basis to use any force upon Jackson, and a jury could therefore find Defendant Pritchett's use of force was malicious, gratuitous, unreasonable, and unnecessary. Based on the foregoing, the Court should deny Pritchett's Motion for Summary Judgment.

Respectfully submitted,

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)
ZIPKIN WHITING CO., L.P.A.
The Zipkin Whiting Building
3637 Green Road
Beachwood, Ohio 44122
Phone: 216-514-6400
Fax: 216-514-6406
Email: zfwlpa@aol.com
    kgross@zipkinwhiting.com

*Counsel for Plaintiffs Tabatha Jackson and Phyllis Davis*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I certify this memorandum complies with the page limit for standard track, as set forth in Local Rule 7.1.

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)

*Counsel for Plaintiffs Tabatha Jackson and Phyllis Davis*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on March 3, 2023, via the Court's CM/ECF system upon:

Michael J. Stewart, Esq.
Brendan D. Healy, Esq.
Jillian Eckart, Esq.
CUYAHOGA COUNTY PROSECUTOR'S OFFICE
The Justice Center, Courts Tower
1200 Ontario Street, 8th Floor
Cleveland, OH 44113
Phone:(216) 443-6673; (216) 698-6447; (216) 443-7618
Fax: (216) 443-7602
Email: mjstewart@prosecutor.cuyahogacounty.us
       bhealy@prosecutor.cuyahogacounty.us
       jeckart@prosecutor.cuyahogacounty.us

*Attorneys for Defendant Cuyahoga County*

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)

*Counsel for Plaintiffs Tabatha Jackson and Phyllis Davis*
